National Bank of Bedford *v.* Dr. J. C. Stever, Appellant.

*Principal and agent—Banks and banking—Discounting note—Cashier
—Notice to bank.*

The knowledge of an authorized agent acquired in the course of a given transaction within the scope of the agent's authority, is the knowledge of the principal.

The knowledge of the cashier of a bank of a defense to a promissory note, if acquired in the course of the transaction which results in the discounting of the note, is the knowledge of the bank, and will deprive it of the position of an innocent holder for value.

The question was not raised, and is therefore not decided, whether a clause in a promissory note waiving the benefit of the exemption laws impairs its negotiability.

Argued April 25, 1895.   Appeal, No. 221, Jan. T., 1895, by defendant, from judgment of C. P. Huntingdon Co., Sept. T., 1894, No. 42, on verdict for plaintiff.   Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ.   Reversed.

Assumpsit on a promissory note.   Before FURST, P. J.

At the trial it appeared that on February 12, 1892, defendant delivered the note in suit which was for $5,150, to L. B. Doty.   At the time L. B. Doty was soliciting subscriptions for the stock of a proposed company to purchase the Bedford Springs Hotel property.   Defendant agreed to take one hundred shares of the stock, and gave the note in suit in payment therefor.   At the same time the following agreement in writing was entered into between Doty and defendant.

" THREE SPRINGS, PA., February 12th, 1892.

" J. C. Stever having subscribed for one hundred shares of the capital stock of the Bedford Springs Company, in connection with the syndicate I am now organizing to buy a majority of the said stock or a controlling interest, and said J. C. Stever having given his promissory note for $5150, at six months, in payment for the same, the one hundred shares of stock above mentioned being held as collateral security for the payment of said note, I hereby appoint him as Resident Physician at the Bedford Springs Hotel, and, as such, agree to furnish him an office at the Springs and to board and lodge himself and wife

at the Springs during the open seasons, free of charge, until he be placed on a salary and makes other arrangements with the Board of Directors. I also agree to assist J. C. Stever to renew, from time to time, and carry $4000 of the above note, in order to give him an opportunity to pay the same out of the receipts incident to his position as Resident Physician, or Chief of the Medical Department of the Springs. Should I fail to obtain sufficient subscriptions to enable the syndicate to purchase a controlling interest in the Bedford Springs Company, the above mentioned note is to be returned. It is also to be understood that our purpose is to put in new, improved baths at the Bedford Springs and attach a sanitarian feature to the Hotel and keep the various places open the entire year; and the said Dr. Stever is to assist me in the work; and that his compensation is to be increased from time to time, according to the value of his services to the Company.

"Witness my hand this day and date above written.

(Signed)        "L. B. DOTY."

On Feb. 26, 1892, the note was discounted by the First National Bank of Bedford. Doty failed to carry out his plan of buying the Bedford Springs property, and when the note became due on the 15th of August the bank renewed the note. The testimony as to what occurred at the time the note was renewed is quoted in the opinion of the Supreme Court.

The court charged in part as follows:

"On the 26th of February, two weeks after the date of this note, the note was discounted by the First National Bank of Bedford, the plaintiff in this suit. That note would mature six months from its date, which would be about the 12th of August of the same year. On the 12th or 15th of August, Dr. Stever was called upon to renew this note; and, according to the evidence, he went to Bedford to see L. B. Doty and did see him. He staid at the hotel that night and then went to the bank the following day. E. S. Doty is cashier of the First National Bank of Bedford, and a brother of L. B. Doty. Dr. Stever testifies that he went to the bank and had an interview with L. B. Doty and E. S. Doty; and he testifies that E. S. Doty said to him there that he knew all about the consideration of this note, which was equivalent to saying that he knew of

this agreement, because the consideration in the note is expressed in this written agreement that I have read, and said, according to Dr. Stever's testimony, that the signing of this note was to be formal and that Dr. Stever would not be liable upon it. He was liable at that very time; he had been liable on that note from the 26th day of February; and there was nothing that E. S. Doty said or did there that day, which he had authority to say or do, that would release Dr. Stever from his previous liability upon this note; so that what occurred in the bank that day is not material to constitute the defense set up here. [In the first place, when Dr. Stever signed this note, he made a written obligation to pay according to its terms; and his own verbal testimony cannot be received in law to change these terms, because they are the terms that he agreed upon, and he cannot say in law that, because he agreed to pay $5,150, he did not there become liable. The law fixes the liability by that act.] [1] On the 15th of August, this note was renewed at Bedford; and, at the time of the renewal or on the 12th of that month, and in connection with it, Dr. Stever took from L. B. Doty this paper, which reads as follows:

" 'BEDFORD, PA., August 12th, 1892.

" 'I hereby agree to sell certain stock of the Bedford Springs Company, which have been subscribed for by Dr. J. C. Stever and for which he had given his note, and thus relieve him of all liability within a reasonable time.

(Signed)          " 'L. B. DOTY.'

" What is the agreement on the part of L. B. Doty, in the bank, to sell this stock, or certain shares of it, and relieve him from his liability? This is a written paper and its legal effect is for the court; and we say to you, in considering this paper in connection with the whole history of the case, that it is the very opposite in law of discharging Dr. Stever from liability on the note, for it recognizes his liability; and L. B. Doty, in his new covenant, is to assist him in the negotiation of the stock so as to assist in the payment of the note.

" Then on the 18th of February, 1893, so far as we recall the testimony, Dr. Stever renewed this note; and he was not brought in contact with the bank or any of its officers. It seems to have been voluntarily renewed by him at four months;

and it was then again renewed for the last time on the 17th of June, 1893, by Dr. Stever signing a new note, not having any contract with the bank affecting the legal obligation of the note itself.   [On the 6th of October, 1893, the bank or E. S. Doty, its cashier, or E. S. Doty individually—I do not have the letter before me—wrote to Dr. Stever requesting an assignment of his stock as collateral security for the payment of this note. Dr. Stever declined to give that assignment; but he testifies that he prepared an assignment of his stock and inclosed it in a letter to the bank, in absolute payment of the note.   Mr. E. S. Doty, cashier of the bank, testifies that a letter was received from Dr. Stever about that time, but that there was no assignment of the stock in it; and the officers of the bank have testified that they never received any such assignment of this stock, and that they do not have any such paper in their possession or under their control.   And in addition to that, the certificates of stock have been exhibited in this trial, and they are made out to Dr. J. C. Stever and to no one else.   They are to-day in his name and held by the treasurer of the company, E. S. Doty, to be delivered to him and to no one else, upon payment of this note.

"If, therefore, we regard the testimony that Dr. Stever has given, touching the knowledge of E. S. Doty, in which he said he knew of the transaction, referring to the agreement, as notice to the bank before the discounting of the note, we must regard it then as notice of what is contained in the written agreement and in the note itself; and that is not sufficient in law to defeat a recovery here, because the very agreement impliedly, if not expressly, suggests the negotiation of the note and a provision, required by Dr. Stever, that somebody else would assist him to take care of it.   There is no branch of the agreement that is not complied with, so far as we know.] [2]   L. B. Doty was endeavoring to form a syndicate to purchase a controlling interest in the stock of the hotel property; and, if he succeeded in that, Dr. Stever was to be the resident physician; and, so far as L. B. Doty had power to appoint him to that position, he was appointed.   Of course, Dr. Stever would know that unless there was a controlling interest purchased, the appointment would fail, because it would be liable to be controlled by others. Dr. Stever never received that position, so far as this evidence

is concerned. Now, while that part of the agreement has not been kept by L. B. Doty, yet if, upon the faith of that part of the agreement, Dr. Stever did execute and deliver his note for $5,150, providing for the negotiation of that note and its renewal, if that agreement has been violated, a right of action would arise in law against L. B. Doty in favor of Dr. Stever; but it would not go to the extent of defeating an innocent holder for value who paid his money for the note.

" [The authority of the cashier of the bank, so far as notice is concerned, is really the most material question here; and we have ruled, as a matter of law, that E. S. Doty, assuming that he had knowledge of the contents of this agreement, did not have knowledge of any fraud that would vitiate the title to this note in the hands of the First National Bank of Bedford, which discounted it on the 26th of February, 1892.] [4]

" The authority of a cashier is a limited authority, and his acts are only binding upon the bank when he acts within the sphere of his agency. His ordinary duties do not comprehend the making of contracts involving the payment of money, without an express authority from the directors, unless they be such as relate to the usual and customary transactions of the bank, nor is it among his ordinary duties to bargain and sell real estate, or to contract with brokers for that purpose, and the bank will not be bound by it unless previous authority be shown, or unless estopped by a line of conduct recognizing such acts; nor has he authority to transfer judgments or dispose of property of the bank; nor is it within the province of a cashier or president of a bank to excuse the obligations of persons liable to it, either as principal debtors or accommodation makers or indorsers, without payment. And the reason of that is that in an incorporated bank or in a national bank, the officers are really the agents of the stockholders; the stockholders own the bank, the others act as their agents; and must be, and under the law are, held to a faithful discharge of their duties.

" A notice to the cashier of a bank relative to any matter falling within the scope of his official employment, is notice to the bank.

" Admitting these principles, [we say that there was no such notice to the First National Bank of any fraud in this note as would vitiate its title; and, therefore, we say to you that,

under the uncontradicted evidence in this case, the First National Bank of Bedford, the plaintiff here, is an innocent holder for value before maturity; and your verdict must be, under our instructions, in favor of the plaintiff for the amount of the note in controversy. That amount to-day is $5,903.46, and you will render your verdict accordingly.] " [5]

Verdict and judgment for plaintiff for $5,903.46. Defendant appealed.

*Errors assigned* were (1, 2, 4, 5) above instructions, quoting them; (3) in not submitting the question of fact to the jury, whether or not the plaintiff bank received the assignment of the stock in absolute payment of the note, as testified to by Dr. Stever.

*George B. Orlady, W. H. & J. S. Woods* with him, for appellant.—The cashier of an incorporated bank is the general executive officer to manage the affairs in all things not peculiarly committed to the directors, and he is the agent of the corporation and not of the directors: Bissell v. First. Nat. Bank, 69 Pa. 415; Martin v. Webb, 110 U. S. 7; Houseman v. Loan Assn., 81 Pa. 256.

*John M. Bailey,* for appellee.—The uncorroborated testimony of the maker of a note unconditional on its face, that he was not liable according to its terms, especially when contradicted under oath, is not sufficient to carry the case to the jury: Phillips v. Meily, 106 Pa. 536; Meily v. Phillips, 16 W. N. C. 429; Juniata Building Assn. v. Hetzel, 103 Pa. 507.

Knowledge of a cashier of a bank acquired in another capacity than as cashier cannot be imputed to the bank, unless revealed by him to some of the officers thereof: Wilson v. McCullough, 23 Pa. 440; Wilson v. Bank, 7 Atl. Rep. 145; Allen v. Bank, 127 Pa. 51.

The ordinary duties of a cashier are merely ministerial and not in any sense judicial: Bank of U. S. v. Dunn, 6 Pet. 55; Bank of Metropolis v. Jones, 8 Pet. 12; Bank v. Reed, 1 W. & S. 101; Dorsey v. Abrams, 85 Pa. 299; Mapes v. Bank, 80 Pa. 163.

OPINION BY MR. JUSTICE GREEN, July 18, 1895:

If the present action had been brought by L. B. Doty to whom the note is suit was given, as a matter of course, there could be no recovery. It was a part of his written agreement with the defendant, that the note should be returned if he, Doty, failed to obtain sufficient subscriptions to enable the syndicate he was trying to form, to purchase a controlling interest in the Bedford Springs Company. He did fail to accomplish that object and he also failed to do everything else that he agreed to do in the contract, by means of which he induced the defendant to give him, so unwisely, the note in suit. That L. B. Doty was guilty of a vile fraud in his action with reference to this note is too plain for argument. He had the note discounted very soon after it was given to him, and put the proceeds in his pocket without any right and kept them, never gave the defendant the position he agreed to give him, never assumed any responsibility for any part of the note as he agreed to do, and in short gave nothing to the defendant having any value, in return for the note.

But all of this is of no advantage to the defendant as against this plaintiff unless it had notice or knowledge of the agreement between L. B. Doty and the defendant. If it did have such knowledge through some officer for whose acts and whose knowledge it is responsible, then it was not an innocent holder for value, and took the note subject to the same defenses as the defendant had against L. B. Doty from whom it received the note. Did the plaintiff bank have such knowledge? The defendant swears that he had an interview with E. S. Doty the cashier of the plaintiff when the original note came due, in company with L. B. Doty, and that a conversation then took place which he describes as follows:—" I went to the Bedford Bank with L. B. Doty and we went back in the back room inside the bank, and with the cashier and L. B. Doty I explained and we talked the matter over; the cashier said he knew of the agreement, and knew that the note was not to be discounted, but that his brother was obliged to make use of this paper as he was handling a great deal of this stock; and I told him that our original agreement had fallen through, that neither of us could perform the parts we had agreed to, and especially as Doty had violated his part of the agreement, not keeping the note that I

couldn't renew, couldn't go on; they solicited me then to renew to their advantage simply as an accommodation to them. . . . Q. Did E. S. Doty state to you that he knew of this agreement from its start?   A. He did."

If the jury believed this testimony, a question would have arisen whether E. S. Doty had acquired his knowledge of the original agreement between L. B. Doty and Stever in the course of the transaction with the bank, to wit, the discounting of the note.   If he did we think the bank was chargeable with his knowledge.   We held in Bissell v. First National Bank of Franklin, 69 Pa. 415, that, "An incorporated bank has a president, cashier and a board of directors, and the cashier is the general executive officer to manage its concerns in all things not peculiarly committed to the directors by the charter, and he is the agent of the corporation and not of the directors." We decided in that case that the indorsement of a draft by the cashier of a banking firm bound his principals.

In Stockdale v. Keyes, 79 Pa. 251, we held that the knowledge of a member of an unincorporated banking firm, of the facts relating to the issue of the note held by his firm, was knowledge of his firm and prevented them from being considered as innocent holders.

That the knowledge of an authorized agent acquired in the course of a given transaction within the scope of his authority, is the knowledge of his principal is too familiar a doctrine to require argument in its support.

In this case the knowledge of the plaintiff's cashier, if acquired in the course of the transaction which resulted in the discounting of the original note, would be the knowledge of the bank and would deprive them of the position of innocent holders for value.

In addition to that fact it was proved by the testimony of the plaintiff's president, and of E. S. Doty, that the latter was chosen cashier on Jan. 12, 1892, and that prior to that time the cashier was L. B. Doty, the person who procured the original note of Feb. 12, 1892, from the defendant.   It was also proved that at that time and afterwards L. B. Doty was one of the stockholders of the plaintiff bank, to a large amount.   It was also proved that no certificate of stock in the Bedford Springs Company was ever delivered to the defendant, but such a certifi-

cate for 100 shares was in the possession of E. S. Doty who said he got it from his brother L. B. Doty, and that he was holding it for the benefit of his, L. B. Doty's, indorsement. His testimony is somewhat confusing in regard to this stock and the manner in which it was held, whether as collateral security for the bank, or if not, in what other way. The witness was unable to explain why he asked the defendant to execute an assignment of the stock to the bank, and testified at considerable length upon cross-examination, on this subject. Without commenting now in relation to that matter, we think the whole of the testimony should have been submitted to the jury for their consideration.

The learned court below withdrew the case from the jury and gave them a binding instruction to find for the plaintiff for the whole amount of the claim, on the ground that the plaintiff was an innocent holder for value before maturity. We think this was error.

We observe that the note in suit contains a clause waiving the benefit of the exemption laws. Perhaps this may not impair its negotiability. We do not decide whether it does or not as the question was not raised. We reverse the judgment on the second, third, fourth and fifth assignments, the first being without merit.

Judgment reversed and new venire awarded.